UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|                          |   |                          |
|--------------------------|---|--------------------------|
| NATIONAL DENTEX, LLC,    | ) |                          |
|                          | ) |                          |
| Plaintiff,               | ) |                          |
|                          | ) |                          |
| v.                       | ) | Civil No. 18-10484-LTS   |
|                          | ) |                          |
| PHILLIP N. GOLD,         | ) |                          |
|                          | ) |                          |
| Defendant.               | ) |                          |

ORDER ON RENEWED MOTION TO COMPEL ARBITRATION (DOC. NO. 15)

December 12, 2018

SOROKIN, J.

National Dentex, LLC, has sued Phillip N. Gold for allegedly breaching two contracts the parties entered in 2000, when National Dentex acquired Gold's business. Gold asserts that the claims against him are within the scope of an arbitration provision contained in a third contract, also executed in 2000 as part of the same business transaction. He seeks an order dismissing this action or staying it pending arbitration. National Dentex opposes. Because the claims National Dentex has elected to pursue arise under related, but separate, agreements, neither of which contain or incorporate an arbitration clause, Gold's motion to compel arbitration is DENIED.

I.  BACKGROUND[1]

National Dentex "offers a number of products and services designed to assist dentists" in caring for their patients. Doc. No. 12 ¶ 1. Until October of 2000, Gold was the Chief Executive Officer of Oral Arts, a competitor of National Dentex based in Georgia. Id. ¶ 2. Gold sold Oral

---

[1] The Court takes these facts from the First Amended Complaint and the documents appended thereto or referenced therein.

Arts to National Dentex in a transaction which included a stock purchase agreement ("SPA"), an employment agreement ("EA"), and a non-competition agreement ("NCA"), all of which were signed by the parties on October 23, 2000. Id. ¶¶ 3-5; Doc. Nos. 12-1, 12-2, 16-1. Blank copies of the EA, the NCA, and the lease were attached as exhibits to the SPA, as executing those agreements were conditions precedent to consummating the SPA. Doc. No. 16-1 at 17-20.[2]

The SPA stated that it was to be construed pursuant to Massachusetts law and reflected the parties' consent to the jurisdiction of Massachusetts state and federal courts. Id. at 26. It contained the following merger clause:

> Entire Agreement. This Agreement, together with the Schedules and Exhibits, sets forth the entire agreement and understanding among the parties as to the subject matter hereof and merges and supersedes all prior discussions, agreements and understandings with respect hereto. This Agreement and said Schedules and Exhibits may not be amended, changed or modified except by a written instrument duly executed by the parties hereto.

Id. The SPA also contained an arbitration clause that provided, in relevant part:

> Arbitration. Except as otherwise provided in Section 2(e) hereof,[3] or as otherwise agreed by the parties, any controversy, dispute or claim between the parties arising out of, related to or in connection with this Agreement or the performance or breach hereof shall be submitted to and settled by arbitration conducted by the American Arbitration Association in Boston, Massachusetts, in accordance with its commercial arbitration rules as then in effect . . . .

Id. at 27.

The EA and the NCA each: state that they are to be "governed by and construed in accordance with the internal laws of the Commonwealth of Massachusetts," Doc. No. 12-1 ¶ 12; Doc. No. 12-2 ¶ 5; and reflect the parties' consent to the jurisdiction of Massachusetts state and federal courts, Doc. No. 12-1 ¶ 13; Doc. No. 12-2 ¶ 6. In addition, the EA and the NCA each

---

[2] Citations to documents appearing on the Court's electronic docket in this matter reference the docket number, with pincites using to the page numbers assigned in the ECF header.
[3] Section 2(e) of the SPA stipulated that certain disputes regarding a closing balance sheet would be submitted to an accounting firm for resolution. Doc. No. 16-1 at 8.

2

contain a merger clause. See Doc. No. 12-1 ¶ 11 ("This [Employment] Agreement, which contains the entire contractual understanding between the parties, may not be changed orally but only by a written instrument signed by the parties hereto."); Doc. No. 12-1 ¶ 5 ("This [Non-Competition] Agreement may be amended only by an instrument in writing executed by the parties hereto and this Agreement constitutes the entire agreement among the parties hereto as to the subject matter hereof.").

Neither the EA nor the NCA contains an arbitration clause, nor any language explicitly incorporating the SPA and/or its arbitration clause.

Upon completion of the October 2000 sale, Gold became the President of Oral Arts (then owned by National Dentex), a position he held until he resigned at the end of February 2017. Doc. No. 12 ¶¶ 2, 12. According to National Dentex, by September 2017 Gold was acting as a consultant to a competing business, lending that business his name, soliciting former Oral Arts customers on behalf of the new business, and persuading Oral Arts employees to take positions with the new business. Id. ¶¶ 12-13. As a result, "National Dentex was forced to close Oral Arts on September 29, 2017." Id. ¶ 14.

National Dentex alleges that Gold's post-resignation conduct violated his obligations under the EA and the NCA. Id. In the this action, National Dentex seeks a declaratory judgment and monetary damages for the alleged breaches of the EA, the NCA, and the covenant of good faith and fair dealing implicit in both,[4] as well as an equitable extension of the "restrictive covenant obligations" contained in the EA and the NCA "for the duration that [Gold] was in breach of such obligations." Id. at 19-24.

---

[4] The original complaint also alleged breach of this implied covenant as to the SPA, Doc. No. 1 ¶ 95, but National Dentex eliminated that portion of the claim in its First Amended Complaint, the pleading under consideration now.

Gold responded to the First Amended Complaint by moving to compel arbitration, citing the arbitration clause in the SPA which, Gold argues, reaches all disputes among the parties arising from any of the agreements executed on October 23, 2000. Doc. Nos. 16, 17. National Dentex opposed the motion, urging that its claims are limited to breaches of the EA and the NCA, which it characterizes as independent contracts beyond the reach of the SPA's arbitration clause. Doc. No. 18.

II.     LEGAL STANDARD

Questions of arbitrability generally are subject to judicial determination. Dialysis Access Ctr., LLC v. RMS Lifeline, Inc., 638 F.3d 367, 375 (1st Cir. 2011); see Combined Energies v. CCI, Inc., 514 F.3d 168, 171 (1st Cir. 2008) (explaining that whether parties have agreed to arbitrate a particular dispute is a legal question turning on contract interpretation). Although "[f]ederal policy favors arbitration," Combined Energies, 514 F.3d at 171, "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit," AT&T Techs., Inc. v. Commc'ns Workers, 475 U.S. 643, 648 (1986) (quotation marks omitted).

A motion to compel arbitration may be granted only if: 1) there exists a valid agreement to arbitrate; 2) the moving party is entitled to invoke the arbitration agreement; 3) the arbitration agreement binds the other party; and 4) the claims asserted fall within the scope of the arbitration agreement. InterGen N.V. v. Grina, 344 F.3d 134, 142 (1st Cir. 2003). Here, the first three prongs are not at issue. It is undisputed that the SPA contains a valid agreement to arbitrate which National Dentex may invoke and which binds Gold. Resolution of the pending motion, then, turns entirely on the final prong—whether the claims National Dentex has articulated in its First Amended Complaint fall within the scope of the SPA's arbitration clause. That

4

determination "is a matter of both state contract law and federal arbitration law." Bowlby v. Carter Mfg. Corp., 138 F. Supp. 2d 182, 187 (D. Mass. 2001).

A fundamental principle of contract interpretation—the parol evidence rule—generally "bars consideration of prior or contemporaneous oral or written agreements which contradict or supplement a completely integrated writing," absent ambiguity in the writing or certain other specific exceptions. Id. at 188.

III. DISCUSSION

Having carefully considered the relevant contracts, the allegations in the First Amended Complaint, and the legal principles summarized above, this Court concludes that disputes arising under the EA and the NCA are not subject to the arbitration clause in the SPA. This is so despite the fact that all three contracts were executed on the same date as part of the same business transaction among the same parties,[5] and notwithstanding the federal presumption of arbitrability, for reasons thoughtfully expressed by another session of this Court confronted with nearly identical circumstances.

In Bowlby, Judge Gorton considered whether the arbitration clause in a purchase agreement encompassed claims arising under a related employment agreement. 138 F. Supp. 2d at 187-88. Though the employment agreement in Bowlby was executed a few days after the asset purchase agreement, it "was a condition precedent" to the parties' obligations under the explicit terms of the purchase agreement, and a blank copy of the employment agreement was attached as an exhibit to the purchase agreement. Id. at 184, 188. Citing the employment agreement's merger clause, Judge Gorton concluded that each agreement stood "on its own" as

---

[5] Though this fact might justify looking to all three contracts in order to discern the parties' intent and interpret an ambiguous provision in one of them, it does not help Gold's cause here, where the relevant provisions are not infected with ambiguity.

5

"a fully integrated writing," with the employment agreement representing the entire agreement of the parties "with respect to the employment relationship" between the individual selling his business and the entity acquiring it. Id. at 188. That relationship, Judge Gorton explained, was "independent of the buyer/seller relationship between the parties" arising from the purchase agreement, rendering the employment agreement "more than a mere supplement to, or continuation of," the purchase agreement. Id. Because the "main issue" presented in Bowlby's complaint involved "alleged obligations" under the employment agreement, it "simply [was] not something which the parties agreed to arbitrate" in the purchase agreement. Id.

The same reasoning applies squarely to the facts presented here. None of the relevant contracts—the SPA, the EA, or the NCA—contains a clause explicitly incorporating all or part of any other contract. Though the SPA includes as exhibits unexecuted copies of the EA and the NCA, and identifies their signing as conditions precedent to the parties' obligations under the SPA, this detail does not erase the merger clauses present in each document, nor does it change the fact that the relationship created by the SPA (that of buyer/seller) is distinct from and "independent of" the employer/employee relationship that arises from the EA and is at the core of the NCA.[6] The EA's sole reference to the SPA is a provision specifying that a particular paragraph of the EA does not change the SPA (or any other agreement between the parties). Doc. No. 12-1 ¶ 6. The NCA identifies the EA and the SPA as contemporaneous agreements between the parties and acknowledges that execution of the NCA was a "material inducement" to

---

[6] Structural and linguistic distinctions among the three contracts further demonstrate that each was crafted as a separate agreement to govern a particular aspect of the parties' complex business relationship at the time of the sale or moving forward. Indeed, key provisions—the merger clause, the choice-of-law clause, and the consent-to-jurisdiction clause—are worded and positioned slightly differently in each contract, presumably reflecting conscious choices made by the parties drafting and negotiating the documents. And, the SPA's arbitration clause shows that the parties knew how to draft and include such a provision when and where they wished to do so.

6

National Dentex in entering the larger transaction, but nowhere does it incorporate any part of the SPA by reference. Doc. No. 12-2. In these circumstances, neither the law nor the facts justify extending the SPA's arbitration provision to disputes arising under the EA and the NCA.[7]

Moreover, unlike in Bowlby, the facts and claims set forth in the First Amended Complaint are carefully focused on the employment relationship between the parties—specifically, on Gold's obligations under the EA and the NCA, and on the ways in which National Dentex believes he breached those obligations. Compare id. at 188 (identifying counterclaims against Bowlby for fraud and misrepresentation which allegedly infected the negotiation and execution of the purchase agreement itself), with Doc. No. 12 ¶¶ 1-75 (describing the terms of the EA and the NCA and Gold's conduct which allegedly violated those terms after his resignation). As such, none of the presently pending claims raise arbitrable issues which would justify staying this action. Cf. Bowlby, 138 F. Supp. 2d at 188 (finding a discretionary stay appropriate where both arbitrable and nonarbitrable issues were presented).

IV. CONCLUSION

For the foregoing reasons, Gold's renewed motion to compel arbitration and to dismiss or stay this case (Doc. No. 15) is DENIED.

Gold shall answer the First Amended Complaint within fourteen days of this Order.

The Court will hold an initial scheduling conference in this matter on January 30, 2019 at 3:00 PM in Courtroom 13. A separate notice of that conference will issue forthwith.

SO ORDERED.

/s/ Leo T. Sorokin
United States District Judge

---

[7] Nearly all of the cases cited by Gold involve materially different facts, decisions by courts in other jurisdictions, or both. See Doc. No. 18 at 16-17 (distinguishing the case law cited in Gold's opening brief).